We'll hear argument now in the case of Hartford Accident and Indemnity Company against Lin. Mr. Stinson Good morning. The underlying issue, I think, here is the relationship that big, giant insurance companies have with people who pay for premiums, buy their premiums, pay for insurance, and then go home. In case they have a loss. And in particular, unlike a third-party situation and a first-party situation, in this case, my client's, Mr. Lin's, employer, they purchased underinsured coverage. This case all began when Ms. Chicky, who was working as a stripper at Club O, got drunk, got on I-294, and crashed into the side of my client's truck as he's driving from food deliveries for Win-Win Seafood, causing his vehicle to go off 294 into the ditch and seriously injure him. He obviously, Ms. Chicky was not only drunk, she had no driver's license and hadn't had one for five years. The last I checked, she's still in prison for this. And in this situation, Hartford, after we made an underinsured claim, has never taken any position about whether Ms. Chicky was at fault for this. So the question becomes, is it okay when his employer Counsel, we are not a jury. If you would make a legal argument, we'd appreciate it. There are three legal arguments that we made in our brief. The first one is that under the Hennessy case, which was decided by the Seventh Circuit Court of Appeals, that when we requested arbitration or it was decided that the provision in the policy that allowed for arbitration but did not mandate it, that once that decision was made and we had a 155 claim, that under Hennessy, the bad faith should have been arbitrated. And we read the Hennessy case as saying and mandating that in that situation that should have occurred. Judge Connelly did not address that. Let me just narrow the point here. If we look at the arbitration clause and the endorsement, where from that language are we able to draw that the workers' compensation would be pulled from that language on the motion to compel? The question was whether or not the district court erred in making the determination not to compel arbitration on Hartford's question regarding workers' compensation. We didn't appeal that. I mean, the part about whether or not the set-off should have been decided by district court, we did request that the arbiters decide that. But once Judge Connelly decided that, we never took issue with it and our notice of appeal does not suggest otherwise. There are cases out there where courts have mandated that set-offs be decided by arbiters, but there are plenty that support exactly what Judge Connelly did on that point. And we didn't appeal that specifically because we thought that that was a reasonable position for him to take. Can I just break in and ask? As I understood this, your complaint as far as it's concerning arbitration is that the bad faith claim didn't get added to the scope of the arbitration. But the issue there is, Judge, arbitration, as you know, is a creature of contract. This arbitration agreement isolates two things. Legal entitlement to recover damages, that's number one, and amount of damages, number two. And the arbitrators took that on. There was no big question about legal entitlement. They figure out an amount of damages. But just because you agreed to arbitrate that doesn't mean everything is suddenly arbitrable. It depends on the contract. Well, all I would say on that is you've correctly stated the facts, but Hennessy had the exact same facts, and Judge Posner said that reverse the district's court decision not to send the 155 claim to arbitration. But the language of the arbitration agreement, if I'm recalling, was a bit different in that instance. I disagree. It really depends on the scope of the clause. In the Hennessy case, there was nothing that mandated the 155 issue or any discussion about it. It required arbitration of any dispute that involved interpretation of the agreement. That's a different clause. Well, here's the question. The question was what was fair compensation, and the question was what were the damages. And the question also was whether or not there was a reasonable delay under 155 in paying that. All that's one issue. And Judge Posner correctly said that if you're going to have— Was Judge Posner writing all by himself? No. No, it's an opinion of the court. Opinions speak for the court. That's correct. You should refer to the opinions of the court. Okay. We're not making ad hominem arguments here. Okay. And honestly, the issue that I would like you to turn to, since time is never as long as you think, is the question whether the district court made a mistake by refusing to offset the— on the ground that this was the workers' comp lien and he had to pay it, sort of following, in a sense, the Berry case, or whether the district court was correct instead to follow the Roberts line of cases and say, well, Illinois has—this, of course, is a question of state law— and say that Illinois has chosen to decide that you didn't, quote, actually receive the funds that you had to devote to the workers' comp lien. So there are two distinct lines of cases, and how are we supposed to choose? Well, this is clearly a Roberts situation because it doesn't— there is no—they wanted to argue, which Judge Connelly rejected, that the set-off reduced the amount of the policy limits, and that was clearly rejected. And Roberts says that once you start getting awards that are in excess of the policy limits, that the—at that point, the goal is to fully compensate the injured party, and Roberts applies. And in Roberts, they had the same situation where there was an inadequate recovery, no matter what, because the award is bigger than the policy limits. That wasn't true in Berry. I think Berry is a very different set of facts because it really gets into this argument, whether you accept it, that the question in Berry was this argument about whether or not you could reduce the policy limits, and that's not what happened in this case, and Judge Connelly correctly said that set-offs are not coverage issues. And their argument— Why is it different, though, than just giving Mr. Lynn $100,000 and saying, This is your award. Now, whatever other agreements you have or other subrogation obligations or other debts is your business. It's not ours, and so why doesn't the whole $100,000 come off? I'm a little confused. The arbitration award was $1,050,000. I know. It was $1,060,000. Ms. Chicky's policy was $100,000. We didn't dispute that they were entitled to a set-off for that. What became the dispute is whether or not they should get a set-off under Greeley for the workers' comp. For the workers' comp, yeah. So, I mean, that was essentially what was— But it was about $75,000, right? I'm sorry? The Hartford Fire lien was $73,000 or so, right? Well, that was the lien on the recovery, and we cut them a check back from Lynn's recovery from Ms. Chicky. So we gave them a check before this ever got issued. And the question is, is that a recovery that Mr. Lynn actually got, or is that money that he never saw— Never saw. —from Senator Roberts? Never saw. Never saw a penny of it. I got the check from Chicky's carrier and immediately cut a check out of client funds to the Hartford. So the other part of this— Is that not a tangible benefit, though, as explained in the Berry case, footnote 5? I'm not sure I understand the question. I mean, the point of the matter was is that that's money that he gives up and he never received. And if the idea here is to use insurance coverage to make him whole, the only way to do that is when he's given up that money and now he's got an award at arbitration that's in excess of the limits, that the only way to compensate him for that is to allow that money to be recoverable. I want to turn quickly to the dismissal of the—the 12B6 dismissal of the bad faith claim. And specifically, the district court found first that it was not futile and allowed us to file it. Then we—they said, well, Judge Cannelli said, well, it's a little long under Rule 8. Shorten it down. 130 days later, he then did a reversal and dismissed it after—and found that it was futile. So our position was that his original judgment on this, saying that it wasn't futile, should stand and that nothing factually had changed in the interim on that. And it's important to keep in mind here, when he does his reversal, he tends to focus on this question of whether there was delay caused in the district court. But that's not where we're alleging the delay in the problems occurred. We're alleging that the delay in the problems occurred before the arbiters, where we issue in September of 2019 interrogatories and production requests, and two years later, they still haven't answered them yet. And the policy itself says the local rules apply, and they won't tell us what the local rules are, even though they've issued interrogatories and production that we promptly answered under the Illinois Supreme Court rules. And they complain, well, you didn't produce your client. But, of course, how can I produce my client when they won't even give us answers to written discovery? So I think it misconstrues the fact that we're not saying that the delay was caused in the district court, although I have never seen a case anywhere in the nation where a district court has ordered set-offs to be decided before you have an arbitration award. What if this arbitration award came back at $50,000? And then we already admit there's a $100,000 set-off from Ms. Jickey's policy, so now we've just done all this work and all this decision-making to no avail. As it turned out, there was a need to do it. But we didn't know that when he made the decision to say, I'm going to resolve this issue without discovery and without an underlying arbitration award. Did you ever ask Hartford to make a partial payment on this? Oh, yeah, hundreds of times, yes. So you did ask them, you know, if you calculate everything their way, you come up with about $579,000. Right. So the Illinois Administrative Code 5919.05 says that the insurance company's obligation in the beginning is to complete an investigation and pay any undisputed amount within 30 days. I can't tell you how many letters I sent to that effect. In other words, if you're not going to honor our demand for $900,000, the remainder of the policy, at least pay us the undisputed amount, which is required under statute. And the House case supports that conclusion as well. I've got about two and a half minutes left. I'm going to save it for rebuttal if it's okay. Certainly, counsel. Ms. Murphy-Petros. Good morning, Your Honors, and may it please the Court. Melissa Murphy-Petros for Hartford Accident and Indemnity. I'll go first to the $73,000 issue that Judge Wood raised. Our position, as you've read, is that that full $100,000 that was received by Mr. Lynn needs to be reduced from the policy limit pursuant to Section D2 of the endorsement, which states all sums paid or payable on behalf of the insured. That's the way that the language reads. There's nothing ambiguous about that. So here's my only issue with that. There are these two lines of cases. There's the Roberts line and there's the Berry line. And if you were to ask me, the Berry line makes more sense. But on the other hand, this is a question of Illinois law. And Illinois seems to care about what they're calling actual receipt of the money. And in Roberts, it looks a lot like this case. And if you were to follow Roberts, I think you would say Mr. Lynn did not actually receive that $73,000. And then you might say, well, you know, two lines of cases. But Illinois courts have actually reaffirmed Roberts even after this court decided Berry. There's acuity against Decker, maybe other cases. And so even if I personally think it's a foolish rule, no one in Illinois asked me to make up the rules for Illinois. So isn't it our obligation to follow what we think an Illinois court would do? And doesn't that take us to Roberts? Yes. And that also takes me to my second point with respect to Berry. The second provision, an alternative provision, in the endorsement is Section D4, which prohibits the receipt of duplicate benefits. And the Berry court predicted that in Illinois they would look at this same situation and say that the full amount received from the settlement with the underinsured driver was, in fact, received for the benefit of the injured party. And that the amount paid to satisfy the workers' compensation lien was extended on the benefit of that party. I mean, otherwise, you know, here, for example, Mr. Lynn would have had to pay that lien himself. It's a statutory obligation. So the fact, as Berry says, the fact that the middleman was cut out doesn't alter the fact that he received it for purposes of D4. And I understand that line of argument. I'm just having trouble seeing how it's consistent with Roberts, especially since this is also a case where now we know from the arbitrators we'll accept that $1 million and whatever it was, $1 million and change award. He's not going to get compensated more than the total amount of his damages. He's still under, you know, based on all these various insurance policies. He concedes that the first $100,000 goes off the policy limit. So he gets down to the $900,000 readily. And then the question is how many other deductions are there? But I know it's a little bit hard to put yourself in the mindset of somebody who's taken an approach that doesn't seem logical to you. But why isn't this the way Illinois has chosen to allocate these losses? Well, again, I think we just need to focus on the fact that we do have two separate policy provisions. Either one of which could apply here. The Roberts and its line of cases focus on D2 in terms of, you know, what did this person actually receive in calculating the reduction of limit? Whereas Barry looked at Section D4, which specifically says no receipt of duplicate payments. And that this would be a duplicate receipt of workers' compensation benefits to not apply this additional further reduction to the policy limit. So I think also I would say, and I know you guys are who you are. And so I should maybe go down the street and say this. You know, I do think the Roberts, it's a stretch. It's one little paragraph in the appellate court decision in Roberts. And that decision then was later reversed by the Illinois Supreme Court. There's really no analysis in Roberts. But to your point, yes, other Illinois appellate courts have picked up on that paragraph. But with respect to D2, here D4 we maintain in our briefs and below also applies. And that was the provision that the Barry court was looking at. So we would advocate the same result with respect to the $73,000. Okay, thank you. With, you know, with respect to, I will just turn briefly to some of the questions that were raised with opposing counsel. With respect to the arbitration of bad faith and workers' compensation, you know, the endorsement does not provide that. As your honors recognize, the endorsement states that arbitration may be had on the liability of the underinsured driver, the amount of damages incurred. These other issues certainly are not within the scope of that provision. Hennessy doesn't change that result. It's a very different arbitration agreement. It says what it says, but it's not the same. As here, certainly we maintain that the district court correctly dismissed the bad faith claim. Again, for all of the reasons in our brief, they're really, as Judge Kennelly, we maintain properly found. We didn't have an obligation to pay the claim until the arbitration, which was requested by the defendants to ascertain the amount of damages, was held. When that arbitration was held, we paid the claim within two months. So is it your position that because Mr. Lynn was the requesting party for the arbitration that he has somehow waived any complaint about the amount of time the arbitration takes? No, no, that's not our position. However, as discussed at length in our brief, to the extent that there was a delay in the arbitration, that really falls on Mr. Lynn's side of the V, so to speak. He requested arbitration in June of 2017, and his claim in the arbitration was held in abeyance at his request of Hartford while they worked through the case against Miss Chickie and the workers' compensation proceedings. On July 11, 2019, which is the date on which his workers' comp claim was resolved, he issues what he calls a final policy limit demand to Hartford of $900,000 on threat of a bad faith action. In that letter, he also says he values his claim at $2.5 million. November 21 of 2019, Hartford answers, explaining its position with respect to the workers' compensation reduction of the limit of insurance. But is that the letter where Hartford has this extremely low ball, $100,000? They offered $100,000, yes. That's pretty. I mean, even as they've just conceded that the policy limits might be considerably higher. I obviously wasn't involved at that stage. But in any event, at this point now, there is a dispute on claim valuation. He says $2.5. But what's happening between July 11 and November 21? Because he's saying, I am repeatedly asking. There was. Yes, there were a few letters from Mr. Lynn. I don't know. I can't tell you precisely. The record isn't clear on the Hartford side. Although, as we argued below, and Judge Connelly also recognized, I think it takes time. They're doing their research and their coverage analysis and what have you. So four months to respond is perhaps a little less than ideal. But it's not unreasonable. It's not vexatious. So now we're at November 21 of 2019. We have a dispute on the actual damages, $2.5 or $100,000. Let's go to arbitration. And at that point, the arbitration took quite a long time. And as detailed in our brief, these were many actions that were brought by the defendants, various motions to compel arbitration, motions to subpoena numerous other folks not involved in this litigation. There was a motion to compel claim adjustment, a motion to withdraw the arbitration demand, reporting us to the Illinois Insurance Department. There was all kinds of things that we did not undertake. So once the arbitration finally occurred, he was paid within a couple of months. So I think Judge Connelly saw all that and properly granted the 12B6 motion to dismiss that claim. Unless your honors have further questions for me? Nope. Thank you. Hearing none, thank you. Mr. Stinch, anything further? Yes, thank you. Just a few quick points. One is the Buis case, which Judge Connelly relied upon when he initially said that our counterclaim for bad faith was good, is a right-on-point case that basically says- There was no bona fide dispute between the parties in that case, right? Right, and there wasn't in this case either. They've never valued this claim. They've just insisted to go to arbitration. They never came back to us. They did make a settlement offer, but a settlement offer is not a valuation of the claim. If they would have come to us and said, you know what, we've done our investigation- This is not a jury trial, counsel. If they would have come to us and said, we did an investigation, and based on this fact, this fact, this fact, and this fact, this is how we value the claim, that's one thing. But a settlement offer is just basically, we're denying liability, we didn't do anything wrong, here's our take-it-or-leave-it number. That's not what insurance companies are allowed to do. The business of insurance is when somebody that paid a premium to your company makes a claim. You, within 60 or 90 days, according to Elliott Flood, the insurance expert- I sincerely suggest that you calm down. Elliott Flood's report, which was considered by Judge Connelly, says that insurance adjusters have an obligation within 60 or 90 days of somebody making a claim to complete an investigation and come up with their valuation that is fact-supported and to take a position about liability. They never did that. To this day, they've never done that. We got their internal records at some point, and we found out that their arbiter, who valued this case at $1,050,000, he signed the verdict form that said that that's what the case is worth, that internally they had valued this claim at $200,000, which is a vast world of difference between those two numbers. Their own hired person that showed up at the arbitration agreed it was worth over $1 million. And I would note that the district court, under Greeley, accepted the reasoning of the Greeley court, but then had a misapprehension of the facts. This court can correct that. It can look at the facts and realize that the language in the Greeley policy in this case were the exact same endorsement, even though they're different insurance companies, and that Greeley is on all fours, and that when you take the facts and you apply Greeley, as the district court did, if he had been correct about the facts, he would have reached the correct conclusion under Greeley. Thank you, counsel. The case was taken under advisement.